# No. 21-20127

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

TRAFIGURA TRADING LLC,

Plaintiff-Appellee

v.

UNITED STATES OF AMERICA,

Defendant-Appellant

ON APPEAL FROM THE JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS

## PETITION FOR REHEARING EN BANC

DAVID A. HUBBERT
  *Deputy Assistant Attorney General*

FRANCESCA UGOLINI          (202) 514-3361
MICHAEL J. HAUNGS          (202) 514-4343
JUDITH A. HAGLEY           (202) 514-8126
  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

*Of Counsel:*
JENNIFER LOWERY
  *United States Attorney*

1389381.1

# RULE 35(b)(1) STATEMENT

This appeal concerns a question of exceptional importance: the constitutionality of a statute that Congress has long relied on to finance the Coast Guard's emergency response to oil spills and related efforts to protect U.S. waterways from oil-spill disasters. The plurality opinion concluded that the charge imposed by 26 U.S.C. §4611(b) on exported crude oil is a tax that violates the Export Clause of the Constitution. That conclusion misapplies Supreme Court precedent and allows exporters to avoid their share of a fee system that Congress imposed on all primary beneficiaries of the oil industry (refiners, importers, and exporters) to cover the environmental risk that their product poses to the public. The IRS has received almost $40 million in related refunds claims from taxpayers within the Fifth Circuit and expects more to be filed if the panel's decision stands.

# TABLE OF CONTENTS

**Page**

Rule 35(b)(1) Statement ...................................................................i

Table of contents...........................................................................ii

Table of authorities .....................................................................iii

Glossary .......................................................................................v

Statement of the issue....................................................................1

Statement of the course of proceedings ...................................1

    A.    Procedural history....................................................1

    B.    Background................................................................2

            1.    The Export Clause and user fees....................2

            2.    Section 4611's charge on crude oil.................3

Argument .......................................................................................7

    The plurality's rationale for invalidating an Act of Congress is "severely flawed and unsupported by the controlling authority," as the dissent concluded .................................7

    A.    Introduction...............................................................7

    B.    The plurality misconstrues the Government services for which all oil industry participants (including exporters) pay a fee.....................................................................11

    C.    The plurality misapplies *Pace* and *U.S. Shoe*......................16

Conclusion....................................................................................20

Certificate of service ...................................................................21

Certificate of compliance ............................................................22

# TABLE OF AUTHORITIES

**Cases:**                                                                          **Page(s)**

*Apex Oil Co. v. United States*, 208 F. Supp. 2d 642
  (E.D. La. 2002) ............................................................... 14
*In re Frescati Shipping Co.*, 886 F.3d 291 (3d Cir. 2018),
  *aff'd sub nom. CITGO Asphalt Ref. Co. v. Frescati
  Shipping Co.*, 140 S. Ct. 1081 (2020) ................................... 5, 6, 12
*In re Oil Spill by the Oil Rig "Deepwater Horizon,"* 148 F.
  Supp. 3d 563 (E.D. La. 2015) ........................................ 18
*Pace v. Burgess*, 92 U.S. 372 (1876) .................... 2, 8-10, 13, 16, 17, 19
*Rice v. Harken Exploration Co.*, 250 F.3d 264
  (5th Cir. 2001) ................................................................. 4
*United States v. U.S. Shoe Corp.*, 523 U.S. 360
  (1998) .............................................................. 2, 3, 8-11, 16, 17, 19

## Constitution and Statutes:

U.S. Const., Art. 1, §9, cl.5 .................................................. 2

Comprehensive Environmental Response, Compensation,
  and Liability Act of 1980, P.L. 96-510, §§211, 221,
  94 Stat. 2767 .................................................................. 5
Oil Pollution Act of 1990, P.L. 101-380, 104 Stat. 484 ................. 4, 18

Internal Revenue Code (26 U.S.C.):

§4611 ..................................................... 2, 3, 5-8, 10-16, 18
§4611(a) ........................................................................ 5
§4611(b) .................................................................. i, 1, 5
§4611(e) ........................................................................ 5
§4611(e)(1) .................................................................... 5
§4611(f) ........................................................................ 5
§9509(b)(1) .................................................................... 5
§9509(c) ........................................................................ 5

**Statutes (cont'd):**                                    **Page(s)**

    33 U.S.C.:

        §1321(c) ........................................................................ 5
        §1321(d) ....................................................................... 5
        §§2701-2720 ............................................................. 4, 7
        §2712 ........................................................................... 5

**Legislative History:**

    H.R. 96-1016 (II) (1980) ................................................ 3, 15
    H.R. 99-253 (II) (1985) ....................................................... 14

    Joint Committee on Taxation, *Description of Revenue*
       *Aspects of Proposals relating to Hazardous Substance*
       *Pollution*, JCS-43-80 (1980) ........................................... 6

    S. Rep. 96-848 (1980) ........................................... 6-8, 14, 15
    S. Rep. 101-94 (1989) ......................................... 4, 7, 8, 15

**Other Authorities:**

    Thomas A. Barthold, *Issues in the Design of*
       *Environmental Excise Taxes*, 8 J. of Eco. Perspectives
       133 (1994) ............................................... 3, 7, 9, 12, 15
    Janet E. Milne, *Environmental Taxation in the United*
       *States: The Long View*, 15 Lewis & Clark L. Rev. 417
       (2011) .......................................................... 7, 12
    Jonathan L. Ramseur*, Congressional Research Service,
       RL33705, *Oil Spills: Background & Governance*
       (2017) ...................................................... 3, 4, 7, 18

1389381.1

## Glossary

CRS        Congressional Research Service

IRS        Internal Revenue Service

Op.        Opinion of the panel, dated March 24, 2022

OPA        Oil Pollution Act of 1990

ROA        paginated electronic record on appeal

## STATEMENT OF THE ISSUE

Whether the tax imposed under §4611(b)[1] on crude oil exports violates the Export Clause of the Constitution or is instead a permissible user fee for the Government's risk-management services related to oil spills.

## STATEMENT OF THE COURSE OF PROCEEDINGS

### A.    Procedural history

Trafigura Trading L.L.C. purchases and exports domestic crude oil from the United States.  (ROA.93, ROA.854.)  During the years at issue (2014-2017), Trafigura exported approximately 50 million barrels of crude oil, mainly on vessels out of ports in or near the Gulf of Mexico. (ROA.93-314, ROA.854.)  Trafigura remitted $4,215,924 under §4611(b) to the IRS for those exports.  (ROA.9-10, ROA.315.)

Trafigura brought this suit in the District Court, seeking a refund. (ROA.8-12.)  The parties cross-moved for summary judgment.  Trafigura argued that the charge is an unconstitutional tax on exports.  (ROA.77-91.)  The Government argued that the charge is a permissible user fee.

---

[1]  Unless otherwise indicated, "§" refers to the Internal Revenue Code (26 U.S.C.), as in effect during the years at issue.

(ROA.708-713.)  The District Court agreed with Trafigura.  (ROA.854-865.)  A panel of this Court affirmed in a plurality opinion authored by Judge Ho, with Judge Wiener concurring only in the judgment.  (Op.1-15.)  Judge Graves dissented.  (Op.16-25.)

## B.    Background

### 1.    The Export Clause and user fees

The Export Clause bars Congress from imposing a tax on exports.  U.S. Const., Art. 1, §9, cl.5.  It does not, however, bar Congress from imposing a "user fee" on exports.  *United States v. U.S. Shoe Corp.*, 523 U.S. 360, 363 (1998) (citing *Pace v. Burgess*, 92 U.S. 372 (1876)).

Section 4611 refers to the charge it imposes as a "tax."  But the fact that Congress has labeled a particular charge a "tax" does not dictate its treatment under the Export Clause.  *U.S. Shoe*, 523 U.S. at 367.  Rather, to determine whether a governmental charge is a permissible "user fee" or an impermissible "tax" under the Export Clause, the Court must focus on how the charge "operat[es]."  *Id.*  Where the charge is designed to raise general revenue, it is a tax for purposes of the Export Clause; where the charge is "designed as

compensation for Government-supplied services, facilities, or benefits," it is a "user fee." *Id*. at 363.

Not every charge imposed by the Internal Revenue Code is a "tax" in this sense. Some charges referred to as a "tax" in the Code are actually designed to be "user fees." Barthold, *Issues in the Design of Environmental Excise Taxes*, 8 J. of Eco. Perspectives 133, 134-135 (1994). For example, monies collected by the IRS may be designed to operate as "insurance premia in a mandated scheme of risk pooling" whereby a particular industry pays for Government services targeted to problems caused by that industry. *Id*. (citing §4611 as an example).

### 2.     Section 4611's charge on crude oil

During the years in issue (2014-2017), the charge imposed by §4611 on crude oil was designed to fund the Government's efforts to respond to and address damage to the environment and third parties caused by the oil industry. By way of brief background, Congress has long been concerned about the environmental risks posed by crude oil. *See, e.g.*, H.R. 96-1016 (II), at 3-5 (1980). Prior to 1990, however, there was no single comprehensive law that specifically addressed oil pollution to U.S. waterways and coastlines. Ramseur, Congressional

Research Service, RL33705, *Oil Spills:  Background & Governance* 11-12 (2017) ("2017-CRS-Report").  In 1990, prompted by the Exxon-Valdez oil spill in Prince William Sound, Alaska, Congress passed the Oil Pollution Act of 1990 ("OPA"), P.L. 101-380, 104 Stat. 484 (codified at 33 U.S.C. §§2701-2720).  S. Rep. 101-94, at 2 (1989).  The OPA federalized the response to oil-spill incidents to eliminate the loss of "'precious time'" that occurred under the prior regime that relied on, and waited for, the oil industry to "'marshall its cleanup forces'" and to manage the risks related to oil transportation.  2017-CRS-Report at 12 & n.40 (quoting legislative history).

The OPA provides a comprehensive framework for assessing liability for costs and damages associated with oil spills in U.S. navigable waters and was intended "to streamline federal law so as to provide quick and efficient cleanup of oil spills, compensate victims of such spills, and internalize the costs of spills within the petroleum industry."  *Rice v. Harken Exploration Co.*, 250 F.3d 264, 266 (5th Cir. 2001).  Under the OPA and related legislation, the federal government — primarily the Coast Guard — manages the environmental risks related to oil spills, including preparing for, directing, and coordinating

oil-spill cleanup.  *See* 33 U.S.C. §1321(c), (d).  The OPA ensures that

funds are immediately available for that government service.  33 U.S.C.

§2712; I.R.C. §9509(c).

To pay for that service, §4611 imposes a per-barrel charge on

crude oil.  The charge is paid by the primary participants in the crude

oil industry — refiners, importers, and exporters.  I.R.C. §4611(a)&(b).

During the years at issue, all amounts received under §4611 were

expressly "appropriated to the Oil Spill Liability Trust Fund,"

§9509(b)(1), and could be used "only" to fund the Government's

specifically delineated activities related to oil spills, §9509(c).[2]  By

administering the Fund pursuant to that statutory authority and

thereby managing the environmental risk related to oil spills, the

Government provides a sort of "insurance" for the oil industry.  *In re*

---

[2] Section 4611 was first enacted in 1980 and was used to support a different trust fund (the Hazardous Substance Response Trust Fund (usually referred to as the Superfund)) from 1980-1995.  Comprehensive Environmental Response, Compensation, and Liability Act of 1980, P.L. 96-510, §§211, 221, 94 Stat. 2767, 2797, 2801.  During 1990-1994, the tax imposed by §4611 supported both the Superfund (§4611(e)) and the Oil Spill Liability Trust Fund (§4611(f)).  The Superfund tax expired at the end of 1995 and has not been reenacted.  I.R.C. §4611(e)(1). Therefore, during the years in issue (2014-2017), all money obtained under §4611 was appropriated to the Oil Spill Liability Trust Fund.

*Frescati Shipping Co.*, 886 F.3d 291, 308 n.24 (3d Cir. 2018), *aff'd sub nom. CITGO Asphalt Ref. Co. v. Frescati Shipping Co.*, 140 S. Ct. 1081 (2020).

Section 4611 was intended to establish a "legislative fee system." S. Rep. 96-848, at 21 (1980). In computing §4611's per-barrel charge on crude oil, Congress relied on "three criteria" to "develop a fair fee system" that would spread the costs of the Government's services throughout the oil industry. *Id*. Although Congress intended the §4611 charge to operates as a fee, it formally labeled it a "tax" because it is collected by the IRS. *E.g.,* Joint Committee on Taxation, *Description of Revenue Aspects of Proposals relating to Hazardous Substance Pollution*, JCS-43-80, at 7-8 (1980) (explaining that the "response fund would be financed by industry fees" and that the "fees would be assessed and collected by the [IRS] as if the fee were a manufacturers excise tax").

# ARGUMENT

**The plurality's rationale for invalidating an Act of Congress is "severely flawed and unsupported by the controlling authority," as the dissent concluded**

## A.    Introduction

After the oil industry proved itself incapable of managing the environmental risks attendant to transporting crude oil, Congress was compelled to intervene.  It set up a regime whereby the Government (primarily the Coast Guard) would provide the necessary risk-management services and the industry would pay for those services through a "legislative fee," the per-barrel charge imposed by §4611 on refiners, importers, and exporters of crude oil.  S. Rep. 96-848, at 21; S. Rep. 101-94, at 5-6; 2017-CRS-Report at 11-12 & n.40.  Amounts collected under §4611 are appropriated to the Oil Spill Liability Trust Fund, which is administered by the Coast Guard and "serves in effect as an industry-funded risk pool."  Milne, *Environmental Taxation in the United States: The Long View*, 15 Lewis & Clark L. Rev. 417, 436 (2011); Barthold, above, at 134-135 (same).

The industry-funded risk pool insures against future oil spills that require Government services related to oil-spill cleanup, remediation, and prevention.  Milne, above, at 436-437; *see* 33 U.S.C. §§2701-2720.

To defray the cost of those services, Congress imposes a charge under §4611 on the three key members of the oil industry — refiners, importers, and exporters of oil — that profit from imposing risk on U.S. natural resources. S. Rep. 101-94, at 5-6. Congress chose this risk-pooling method after determining that it was the most "equitable and rational method" of allowing the oil industry to operate without imposing the external costs of that operation on the public or third parties. S. Rep. 96-848, at 72. Thus, the cost of the Government's remedial measures is paid by the industry that benefits from the risk to public resources that the Government manages.

The question in this case is whether requiring exporters to bear their share of §4611's risk-pooling expense violates the Export Clause. That question turns on how §4611 should be construed for purposes of the Export Clause. If §4611's charge is construed to be a "user fee" rather than a "tax," then it does not violate the Export Clause. *U.S. Shoe*, 523 U.S. at 363 (citing *Pace*, 92 U.S. at 375-376). As pertinent here, taxes imposed on "those who benefit" from a certain activity — such as an industry that profits from the transportation of environmental pollutants, risking the need for Government cleanup

services — operate as "user fees." Barthold, above, at 134. This is particularly appropriate where (as here) the tax operates as an "insurance premi[um] in a mandated scheme of risk pooling" intended to cover the costs of Government risk-management services. *Id*. at 134-135.

The Supreme Court has twice addressed whether a charge is a permissible "user fee" for purposes of the Export Clause. It first did so in *Pace*, almost a 150 years ago. *Pace* concerned a federal excise tax on tobacco that by its terms did not apply to exported tobacco. 92 U.S. at 374. To prevent tax fraud, tobacco intended for export had to carry a stamp that cost 25 cents (later reduced to 10 cents) per package of tobacco. *Id*. The Court rejected the argument that the stamp charge was really a tax on exports that violated the Export Clause. *Id*. at 375-376. As the Court explained, the stamp charge was "intended for no other purpose" than to "prevent fraud" and operated as "fees" for the Government's fraud-prevention services. *Id*. at 375.

In *U.S. Shoe*, the Supreme Court considered an Export Clause challenge to the tax on shipments of commercial cargo through the nation's ports that was intended to pay for harbor maintenance and

development. 523 U.S. at 363-364. The tax was imposed on domestic shipping, imports, and exports and was calculated as a percentage of the cargo's value. *Id.* The Court concluded that the harbor maintenance tax was properly viewed as a tax for purposes of the Export Clause because of its "operation." *Id.* at 367. In this regard, the Court emphasized that the tax "is determined entirely on an ad valorem basis" and a value-based tax "does not correlate reliably with the federal harbor services used or usable by the exporter." *Id.* at 369. Rather, "the extent and manner of port use depend on [other] factors such as the size and tonnage of a vessel." *Id.* The Court noted that its holding "does not mean that exporters are exempt from any and all user fees designed to defray the cost of harbor development and maintenance," but rather that "such a fee must fairly match the exporters' use of port services." *Id.* at 370.

The charge imposed by §4611 is a permissible user fee that compensates the Government for its oil-spill-related activities necessitated by the risks created by the oil industry, including exporters like Trafigura. The §4611 charge is similar to the charge upheld in *Pace.* Although the Government services in *Pace* (fraud prevention) and

the Government services here (risk management) are different, the charges at issue served the same function — to compensate the Government for its services. Moreover, the charge here is unlike the charge invalidated in *U.S. Shoe*. The charge in *U.S. Shoe* was determined solely by the value of the taxpayer's cargo, a factor wholly unrelated to the Government's services provided there. Here, in contrast, the amount of the charge is determined by the amount of oil transported, a factor that *is* related to the Government's services.

The plurality opinion's contrary conclusion is flawed and would preclude the Government from requiring exporters to pay their share of an industry-wide risk-pooling fund designed to compensate the Government for its response to — and prevention of — oil-related environmental emergencies that occur on an unpredictable basis.

## B. The plurality misconstrues the Government services for which all oil industry participants (including exporters) pay a fee

The plurality concluded that the §4611 charge could not be a user fee because (in its view) there is no "specific service provided to, and used by, the payor" of that charge (Op.12). That is incorrect. Payors of the §4611 charge receive a specific service from the Government —

management of the risk generated by the payors' business.  Whenever an exporter like Trafigura exports oil, it imposes oil-spill risk on a public resource — U.S. navigable waters — and the Government manages that risk.  The charge imposed by §4611 pays for the Government's risk-management service.

Indeed, the risk-management service provided by the Government's administration of the Oil Spill Liability Trust Fund has been recognized by courts and commentators and likened to "insurance" provided for — and paid by — the oil industry.  *Frescati*, 886 F.3d at 308 n.24; Milne, above, at 436 (observing that "the Trust Fund serves in effect as an industry-funded risk pool"); Barthold, above, at 134-135 (citing §4611's charge as an example of "insurance premia in a mandated scheme of risk pooling").

Similarly missing the mark is the plurality's complaint that §4611 finances a "broad range of initiatives" (Op.12).  Each of the initiatives identified by the plurality — payments to assess natural-resource damage, development of improved oil-pollution technology, and research to minimize oil spills — relates to the risk caused by the oil industry.  Administering those initiatives is part and parcel of the service that the

Government provides to exporters and other payors of the charge — the management of the risk to the public caused by their business. As the dissent explained, "[t]here would be no oil spills, resulting damage, or need for research and development regarding oil pollution if oil was not exported." (Op.21.)

Although the plurality assumed otherwise (Op.13), exporters benefit from this arrangement. Congress could have required the oil industry to establish and administer a similar private program, as a condition to continuing to produce and sell a substance that puts the public at risk. It did not do so. Instead, Congress established a government-run program that was funded by the oil industry. As a fee that exacts "compensation … for services properly rendered," the §4611 charge is "in no sense a duty on exportation" and is "not an infringement" of the Export Clause. *Pace*, 92 U.S. at 375-376. By paying the charge, the exporter receives the Government's risk-management service that allows it to profit from exporting oil even though exportation imposes a risk to public resources.

As the dissent correctly recognized, "charging a fee for using this country's valuable natural resources to conduct one's for-profit business

[is] a 'value-for-value transaction'" not unlike charging a fee to enjoy a national park or museum. (Op.22 n.8.) In other words, "exporters pay and exporters benefit." (Op.22.) The plurality protests that "exporters subsidize a mishmash of anti-pollution measures for the general benefit of society" (Op.13), but ignores the fact that exporters (and other members of the oil industry) create the pollution in the first place and benefit from doing so.

That the §4611 charge was designed to be a user fee for the Government's risk-management service is confirmed by the statutory history. Prior to the establishment of the industry-financed Oil Spill Liability Trust Fund, "large taxpayer subsidies" were required to pay for the Government's "costly cleanup" and related oil-spill activities. *Apex Oil Co. v. United States*, 208 F. Supp. 2d 642, 651 (E.D. La. 2002). By enacting §4611, Congress replaced the taxpayer subsidies with a "legislative fee system." S. Rep. 96-848, at 21; H.R. 99-253 (II), at 41, 52 (1985). Congress concluded that "[f]inancing the Fund primarily from fees paid by industry is the most equitable and rational method of broadly spreading the costs" related to potential environmental pollutants "among all those industrial sectors and consumers who

benefit from such substances." S. Rep. 96-848, at 72. By imposing the charge on oil refiners, importers, and exporters, Congress chose to transfer the costs of oil spills from the general taxpayer to the "industries which create" — and benefit from — the risk of oil spills. H.R. 96-1016 (II), at 5; S. Rep. 101-94, at 5. In other words, Congress enacted §4611 precisely because it did *not* want to finance oil-spill-cleanup costs through a tax.

Ignoring this statutory history, the plurality compares the §4611 charge to local taxes that finance police and fire protection.[3] (Op.12.) The two are not comparable. Taxpayers who pay their local government and receive police and fire protection are not causing the risk that the municipality is managing. Nor are they profiting from that risk. In contrast, here, the oil industry participants contribute to, and profit from, the risk that the Government is paid to manage. A more apt comparison is the charge that banks pay to the Federal Deposit Insurance Corporation to manage the risk of banking by insuring that

---

[3] The plurality also cites to "gasoline taxes [that are] designed to pay for road and infrastructure repair" (Op.13). But gasoline taxes are a prime example of taxes that operate as "user fees." Barthold, above, at 134-135.

depositors are made whole (up to a certain amount) if their bank fails. No one would consider that payment to be a tax — it is a fee that compensates the Government for its risk-management services. The banks pay and the banks benefit by being permitted to engage in a business that puts the public at risk.

### C.   The plurality misapplies *Pace* and *U.S. Shoe*

Under the controlling precedent, a charge is properly viewed as a "user fee" if it is "designed as compensation for Government-supplied services, facilities, or benefits." *U.S. Shoe*, 523 U.S. at 363 (citing *Pace*, 92 U.S. at 375-376). As explained above, all of the activities funded by the §4611 charge are part of the risk-management service provided by the Government to exporters and others that benefit from oil transportation. The charge is "designed as compensation" for that service and, as such, is a user fee. *Id*.

The plurality's conclusion that the §4611 charge is a tax under this controlling authority cannot withstand scrutiny. (Op.11-13.) That the amount of the charge is based on the "quantity" of oil does not make it "more like the tax in *U.S. Shoe* than the user fee in *Pace*" (Op.11). Neither *Pace* nor *U.S. Shoe* held that quantity-based charges cannot be

a user fee. Although the Court in *Pace* observed that the charge in that case "bore no proportion whatever to the quantity" of tobacco exported, 92 U.S. at 375, there was no correlation there between the quantity of tobacco and the Government service (fraud prevention). Similarly, in *U.S. Shoe*, the Court did not address a quantity-based charge and rejected a value-based charge only because the value of the cargo "does not correlate reliably" with the Government service provided in that case. 523 U.S. at 369. Far from ruling that a user fee can never be based on quantity or value — as the plurality suggests (Op.11) — the Court ruled that a user fee cannot be based on value if the "value" of the item taxed "does not correlate reliably" with the services provided. *Id.*

In this case, unlike in *U.S. Shoe*, the basis for the charge at issue — the number of barrels transported — reliably correlates with the Government's service. The service provided by the Government is managing the risk generated by oil exporters and others in the oil industry. The flat per-barrel fee operates as a proxy for each oil industry member's portion of the risk because it was reasonable for Congress to assume that the more oil transported, the greater the risk

posed by a spill, and therefore the greater the need for Government services.

Everything else being equal, a large oil spill will cost the Government more time and effort than a smaller one. Consistent with that proposition, the amount of insurance coverage required by certain parties under the OPA is measured in terms of "barrels" of oil transported. *See* 2017-CRS-Report at 19-20. Indeed, oil spills — and the damages attendant to such spills — are generally reported in terms of the number of barrels spilled. *E.g., In re Oil Spill by the Oil Rig "Deepwater Horizon,"* 148 F. Supp. 3d 563, 569 (E.D. La. 2015) (comparing the impact of the Deepwater Horizon oil spill with that of the Exxon-Valdez in terms of the numbers of "barrels" spilled). Although the actual impact of any given oil spill may depend on several factors — including the factors highlighted by the District Court (ROA.860-863) — the quantity of the oil is an important factor and provides a reliable benchmark for Congress's computation of §4611's per-barrel charge.

That the Government's risk-management services also "benefit society at large" (Op.13) does not preclude the charge for those services

from being a user fee.  Neither *Pace* nor *U.S. Shoe* requires that *only* the exporter benefit from the Government service, as the dissent explained.  (Op.21.)  Indeed, in *Pace*, the charge was paid for the Government's fraud-prevention services and society at large benefits whenever the Government prevents tax fraud.  Moreover, the Government's risk-management services in operating the Oil Spill Liability Trust Fund have been likened to an insurance service (*see*, above, p.12), and insurance is frequently purchased so that third parties can benefit:  Party A pays for risk coverage so that Party B may receive insurance proceeds if a future covered event occurs.

In any event, what the plurality deems a "benefit" to society is merely protection from the oil industry's profit-seeking activities. Because private industry failed to provide that protection by managing the risk of oil spills, the Government had to step in and do so.  The fee that Congress charges for that service merely defrays the Government's costs and as such does not violate the Export Clause when applied to exporters.  The panel's contrary ruling is wrong and deals a blow to a crucial source of funding for environmental disasters.

## CONCLUSION

This appeal should be heard en banc, the judgment of the District Court should be reversed, and judgment should be entered for the United States.

Respectfully submitted,

DAVID A. HUBBERT
  *Deputy Assistant Attorney General*

/s/ Judith A. Hagley

| | |
|---|---|
| FRANCESCA UGOLINI | (202) 514-3361 |
| MICHAEL J. HAUNGS | (202) 514-4343 |
| JUDITH A. HAGLEY | (202) 514-8126 |

  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

*Of Counsel:*
JENNIFER LOWERY
  *United States Attorney*

MAY 6, 2022

# CERTIFICATE OF SERVICE

It is hereby certified that, on May 6, 2022:

- this petition was filed with the Clerk of the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system;

- all required privacy redactions have been made in accordance with Local Rule 25.2.13;

- the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses;

- the electronic and paper submissions are identical as required by Local Rule 25.2.1; and

- all parties are registered ECF users and will be served through the Court's CM/ECF system.

    /s/ Judith A. Hagley
JUDITH A. HAGLEY
*Attorney*

# CERTIFICATE OF COMPLIANCE

## Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

1.  This document complies with the word limit of Fed. R. App. P. 35(b)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

> [X]   this document contains 3,891 words (including the Rule 35(b)(1) Statement), **or**

> [ ]   this brief uses a monospaced typeface and contains _____ lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> [X]   this document has been prepared in a proportionally spaced typeface using Microsoft Office 365 in Century Schoolbook 14, **or**

> [ ]   this brief has been prepared in a monospaced typeface using _____ with _____.

(s)   __/s/ Judith A. Hagley__

Attorney for Appellant United States

Dated:  _____May 6, 2022_____

# OPINION

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 24, 2022

Lyle W. Cayce
Clerk

No. 21-20127

Trafigura Trading LLC,

*Plaintiff—Appellee,*

*versus*

United States of America,

*Defendant—Appellant.*

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:19-CV-170

Before Wiener, Graves, and Ho, *Circuit Judges.*

James C. Ho, *Circuit Judge:**

Alexander Hamilton was non-stop. There were a million things he wanted done. So when he was chosen for the Constitutional Convention, he spoke like he was running out of time. He talked for six hours. The Convention was listless. And among his ideas was the power to tax exports.

But the Southern states feared export taxes would disproportionately harm their economies. They worried Congress would tax them relentlessly,

---

* Judge Wiener concurs in the judgment.

and then turn around and run a spending spree. They knew that, if Congress could tax exports, it would not be a question of if, but of which one.

So they demanded a categorical ban on export taxes. They knew they would have to holler just to be heard. But they would rather be divisive than indecisive. So they didn't throw away their shot. They made an all-out stand: No ban on export taxes, no Constitution.

Northern delegates expressed their disgust—but the South's agenda was there discussed. The North wanted to tax exports and regulate commerce. But the South wanted neither. The delegates were diametrically opposed—foes. But they took a break. And they eventually emerged with a compromise, having open doors that were previously closed: The federal government could regulate commerce, but not tax exports.

The compromise no doubt frustrated many citizens. But they had no say in what their leaders traded away—they weren't in the room where it happened. A group of delegates suggested another approach—export taxes only if approved on a super-majority vote—hoping that would be enough. But the South was not satisfied. It worried that, if it stood for nothing, what would it fall for? So rather than wait for it, they let the proposal burn.

Ultimately, though, Hamilton got more than he gave. And he wanted what he got. But as for the power to tax exports, he was helpless.

As a result, the Constitution forbids Congress from taxing exports. And that resolves this case. The federal government insists that Trafigura Trading must pay a tax on domestic crude oil that it exports from the United States. But the district court said no to this. We affirm.[1]

---

[1] *Cf.* Lisa A. Tucker, ed., *Hamilton and the Law: Reading Today's Most Contentious Legal Issues through the Hit Musical* (2020).

No. 21-20127

## I.

The Constitutional Convention began in Philadelphia on May 25, 1787. 1 Max Farrand, ed., The Records of the Federal Convention of 1787, at 1 (1966). Hamilton did not speak during the first few weeks of the Convention. But "[i]t was predictable that when the wordy Hamilton broke silence, he would do so at epic length." Ron Chernow, Alexander Hamilton 231 (2004). "On Monday morning, June 18, the thirty-two-year-old prodigy rose first on the convention floor and in the stifling, poorly ventilated room he spoke and spoke and spoke. Before the day was through, he had given a six-hour speech (no break for lunch) that was brilliant, courageous, and, in retrospect, completely daft." *Id.*

In that speech, Hamilton set forth his vision for a strong central government, armed with a number of powers that had been omitted in the Articles of Confederation. In particular, he was the first delegate to suggest that the new federal government should have a broad power to tax that would specifically include exports: "Whence then is the national revenue to be drawn? from Commerce, even {from} exports which notwithstanding the common opinion are fit objects of moderate taxation." 1 Farrand, *supra*, at 286.

The power to tax exports was endorsed by a number of fellow delegates. James Madison agreed that "the power of taxing exports is proper in itself, and as the States cannot with propriety exercise it separately, it ought to be vested in them collectively." 2 Farrand, *supra*, at 306. Gouverneur Morris likewise affirmed that "[t]axes on exports are a necessary source of revenue." *Id.* at 307. James Wilson was also "decidedly agst prohibiting general taxes on exports," *id.*, for "[t]o deny this power is to take from the Common Govt. half the regulation of trade," *id.* at 362.

But Southern delegates were firmly opposed to export taxes. The South was the nation's primary exporter, so any federal export tax would disproportionately burden Southern states. *See*, *e.g.*, Erik M. Jensen, *The Export Clause*, 6 FLA. TAX REV. 1, 8 (2003). Southerners feared that the North would control the majority of seats in both Houses of Congress, and would use that power to aggrandize itself at the South's expense by taxing exports. As George Mason put it, "a majority when interested will oppress the minority. . . . If we compare the States in this point of view the 8 Northern States have an interest different from the five Southn. States, — and have in one branch of the legislature 36 votes agst 29. and in the other, in the proportion of 8 agst 5." 2 Farrand, *supra*, at 362.

So a number of Southern delegates voiced firm opposition to the Constitution unless it explicitly prohibited taxes on exports. Charles Pinckney warned that, "if the Committee [of Detail] should fail to insert some security to the Southern States agst. . . . taxes on exports, he shd. be bound by duty to his State to vote agst. their Report." *Id.* at 95. His fellow South Carolina delegate Pierce Butler likewise made clear that "he never would agree to the power of taxing exports." *Id.* at 374.

Northern delegates soon appreciated that, as Roger Sherman of Connecticut put it, "[a] power to tax exports would shipwreck the whole." *Id.* at 308.

There would be no Constitution, then, unless the delegates reached a compromise on the question of export taxes. They did so by trading the power to tax exports for the power to regulate commerce. Specifically, the South wanted to prohibit export taxes and impose a super-majority voting rule for commercial regulations, while the North wanted to permit export taxes and require only a simple majority to regulate commerce. *See* Ben Baack et al., *Constitutional Agreement During the Drafting of the Constitution:*

*A New Interpretation*, 38 J. Legal Stud. 533, 546–47 (2009). So a deal was struck: A group of Northern delegates agreed that they would vote to prohibit export taxes, and in return, a group of Southern delegates agreed that they would vote for the simple majority rule for regulations of commerce. *Id.* at 541 (citing sources).

When the Convention returned to these topics for a final vote, a group of delegates tried to revive the power to tax exports. They proposed a super-majority voting rule for export taxes, "requiring the concurrence of 2/3 or 3/4 of the legislature in such cases." 2 Farrand, *supra*, at 359. Madison formally moved "to require 2/3 of each House to tax exports — as a lesser evil than a total prohibition." *Id.* at 363. But the proposal failed, with every Southern delegation voting in the negative. *Id.* Another proposal would have allowed export taxes for the purpose of regulating trade, while prohibiting such taxes "for the purpose of revenue." *Id.* But that too failed. *Id.*

The Convention eventually adopted the language that now appears in Article I, Section 9 of the Constitution: "No Tax or Duty shall be laid on Articles exported from any State." U.S. Const. art. I, § 9, cl. 5.

The Supreme Court has repeatedly recognized the importance as well as the breadth of the Export Clause. As the Court observed in one of the primary precedents we examine today, "the Export Clause categorically bars Congress from imposing any tax on exports." *United States v. U.S. Shoe Corp.*, 523 U.S. 360, 363 (1998). "[T]he Export Clause allows no room for any federal tax, however generally applicable or nondiscriminatory, on goods in export transit." *Id.* at 367. It is a "simple, direct, unqualified prohibition" on any tax on exports. *Id.* at 368. *See also Fairbank v. United States*, 181 U.S. 283, 290–93 (1901) (observing that it is "obvious" from the text and history of the Export Clause "that the National Government should put nothing in the way of burden upon . . . exports"); *A.G. Spalding & Bros. v. Edwards*, 262

No. 21-20127

U.S. 66, 70 (1923) (recognizing that exports enjoy "liberal protection" from taxation); *United States v. Int'l Bus. Machs. Corp.*, 517 U.S. 843, 860 (1996) ("there is substantial evidence from the [Convention] Debates that proponents of the Clause fully intended the breadth of scope that is evident in the language").[2]

## II.

Trafigura Trading is a commodity trading company that purchases and exports crude oil from the United States. Between 2014 and 2017, Trafigura exported around 50 million barrels of crude oil from oilfields in Texas, Louisiana, and North Dakota. Trafigura remitted over $4 million to the IRS for these exports, as required by 26 U.S.C. § 4611(b). That provision imposes a "tax"—at a rate of 8 or 9 cents per barrel, depending on the year—on domestic crude oil "used in or exported from the United States." *Id.* § 4611(b)–(c)(2)(B).

Proceeds from § 4611(b) go to the Oil Spill Liability Trust Fund. *See id.* § 9509(b)(1). The Fund serves several functions.

To begin with, the Fund operates "much like insurance for the oil transportation industry": Parties pay into the Fund via § 4611(b), and if they are ever liable for the cleanup costs of an oil spill under 33 U.S.C. § 2702, the Fund reimburses them for all expenses above a statutory cap. *In re Frescati*

---

[2] Indeed, the Export Clause played a central role in the defense of judicial review in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803). Without judicial review, Chief Justice Marshall explained, Congress would be able to enact an export tax, and the federal judiciary would have no choice but to enforce it: "Suppose a duty on the export of cotton, of tobacco, or of flour; and a suit instituted to recover it. Ought judgment to be rendered in such a case? ought the judges to close their eyes on the constitution, and only see the law." *Id.* at 179. To Chief Justice Marshall, denying judicial enforcement of the Export Clause was so obviously absurd that it served as a powerful argument in support of judicial review itself.

No. 21-20127

*Shipping Co.*, 886 F.3d 291, 308 n.24 (3rd Cir. 2018), *aff'd sub nom. CITGO Asphalt Ref. Co. v. Frescati Shipping Co.*, 140 S. Ct. 1081 (2020).

But that's not all. The Fund also covers costs incurred by federal, state, and Indian tribe trustees for natural resource damage assessment and restoration; removal costs of discharged oil from foreign offshore units; and related administrative, operational, and personnel expenses. 33 U.S.C. § 2712(a). More still, the Fund supports, among other things, research and development for oil pollution technology; studies into oil pollution's effects; marine simulation research; simulated environmental testing; and grants to universities and other research institutions. *Id.* § 2761(c).

Trafigura contends that § 4611(b) imposes an unconstitutional tax under the Export Clause. It sought a refund for the amount it paid under § 4611(b). But the IRS denied the request. Trafigura then sued to challenge the constitutionality of § 4611(b). The district court agreed with Trafigura that § 4611(b) imposes an unconstitutional tax and granted the refund accordingly. The United States appealed.

We review de novo the district court's grant of summary judgment. *Hernandez v. Reno*, 91 F.3d 776, 779 (5th Cir. 1996).

## III.

When it comes to federal power to tax exports, the text of Article I, Section 9 of the Constitution is categorical: "No Tax or Duty shall be laid on Articles exported from any State." U.S. Const. art. I, § 9, cl. 5.

The ban on the power of the states to tax exports, by contrast, is less sweeping. It states that "[n]o State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, *except what may be absolutely necessary for executing its inspection Laws.*" U.S. Const. art. I, § 10, cl. 2 (emphasis added).

No. 21-20127

The inclusion of this exception in Article I, Section 10—allowing states to impose fees on exports that are "absolutely necessary for executing its inspection Laws"—naturally raises the question: Can the federal government impose similar fees on exports under Article I, Section 9?

Trafigura might argue that the omission of this language from Article I, Section 9 was intentional and must be given meaning. *See*, *e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983) (courts generally presume that drafters act "intentionally and purposely in the disparate inclusion or exclusion" of language) (quotations omitted); *United States v. Estrella*, 758 F.3d 1239, 1252 (11th Cir. 2014) ("When language is included in one . . . provision but not included in another related provision, that omission has an important meaning that [courts] cannot ignore.").

But the United States might respond that Article I, Section 10 simply makes explicit what is implicit in Article I, Section 9—and that the Supreme Court has construed other provisions of the Constitution in a similar manner. *See*, *e.g.*, *Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954) (applying equal protection principles to the federal government); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 213–17 (1995) (same).

In any event, the Supreme Court has resolved this question. It has held that a federal "tax" on exports may be recharacterized—and upheld—as a "user fee," if it is "designed as compensation for Government-supplied services, facilities, or benefits." *U.S. Shoe*, 523 U.S. at 363.

In doing so, however, the Supreme Court has cautioned that courts must carefully "guard against . . . the imposition of a duty under the pretext of fixing a fee." *Pace v. Burgess*, 92 U.S. 372, 376 (1876).

No. 21-20127

## A.

We must decide, then, whether § 4611(b) imposes a tax or a user fee. On its face, the text of § 4611(b) refers to the charge as a "tax." But "we must regard things rather than names" and consider whether the charge functions as "a bona fide user fee." *U.S. Shoe*, 523 U.S. at 367 (quotations omitted).

Two Supreme Court decisions guide the analysis in this case—*Pace* and *U.S. Shoe*.

Start with *Pace*—the "time-tested" and "guiding precedent for determining what constitutes a bona fide user fee in the Export Clause context." *Id.* at 369. *Pace* involved a federal excise tax on tobacco. Congress specifically exempted tobacco intended for export from the excise tax. To combat fraud, however, Congress required all exported tobacco to bear a stamp on its packaging. The stamps cost exporters 25 cents per package (later reduced to 10 cents per package) and were "intended for no other purpose than to separate and identify the tobacco [intended for] export, and thereby, instead of taxing it, to relieve it from . . . taxation." 92 U.S. at 375.

The Court held that the stamp charge was a user fee, not a tax prohibited by the Export Clause. The charge was "in no sense a duty on exportation," but was simply "compensation given for services properly rendered." *Id.* The amount of the fees was "proper" and not "excessive." *Id.* at 375–76. For example, "Congress did *not* limit the quantity or value of the tobacco packaged for export or the size of the stamped package; 'these were unlimited, except by the discretion of the exporter or the convenience of handling.'" *U.S. Shoe*, 523 U.S. at 369 (quoting *Pace*, 92 U.S. at 375) (cleaned up, emphasis added).

Two features of the stamp charge made it a user fee rather than an export tax, as the Court noted in *Pace* and reaffirmed in *U.S. Shoe*. First, it

"bore no proportion whatever to the quantity or value of the package on which the stamp was affixed," and second, it "was not excessive" given the cost of the services to prevent fraud and to "give the exporter the benefit of exemption from taxation." *Id.* (cleaned up).

Next up is *U.S. Shoe*, which involved a "harbor maintenance tax" applicable to "[e]xporters, importers, and domestic shippers" of commercial cargo passing through the nation's ports. *Id.* at 363. The tax was computed on an ad valorem basis, in the amount of 0.125% of the cargo's value. Proceeds were deposited into a trust fund used to finance harbor maintenance and development projects. *Id.* An exporter filed a protest with the Customs Service alleging the unconstitutionality of the toll "to the extent it applies to exports." *Id.* at 363–64.

The Court unanimously agreed that the ad valorem harbor maintenance charge was indeed an unconstitutional tax under the Export Clause, and not a permissible user fee. *Id.* at 363. As the Court explained, a charge is a user fee only if it "fairly match[es] the exporters' use of" government services. *Id.* at 370. That wasn't the case in *U.S. Shoe.* "The value of export cargo . . . does *not* correlate reliably with the federal harbor services used or usable by the exporter." *Id.* at 369 (emphasis added). So the tax was barred by the Export Clause.

*Pace* and *U.S. Shoe* tell us the following. First, we must consider whether the charge under § 4611(b) is based on the quantity or value of the exported oil—if so, then it is more likely a tax. Second, we must consider the connection between the Fund's services to exporters, if any, and what exporters pay for those services under § 4611(b). That connection need not be a perfect fit. *See Pace*, 92 U.S. at 375–76. But a user fee must "fairly match" or "correlate reliably with" exporters' use of government services. *U.S. Shoe*, 523 U.S. at 369–70. Finally, we apply "heightened scrutiny,"

No. 21-20127

*Matter of Buffets, LLC*, 979 F.3d 366, 380 (5th Cir. 2020), and strictly enforce the Export Clause's ban on taxes by "guard[ing] against . . . the imposition of a [tax] under the pretext of fixing a fee," *U.S. Shoe*, 523 U.S. at 370 (quotations omitted).

## B.

The United States admits, as it must, that the "amount of the [§ 4611(b)] charge is based on the volume of oil transported." Exporters pay at a rate of 8 or 9 cents per "barrel"—or 8 or 9 cents per "42 United States gallons." 26 U.S.C. §§ 4611(c)(2)(B), 4612(a)(8). This proportional fee scheme—more oil, more money—is true down to the fraction: "In the case of a fraction of a barrel, the tax imposed by section 4611 shall be the same fraction of the amount of such tax imposed on a whole barrel." *Id.* § 4612(a)(9). So § 4611(b) is by design more like the tax in *U.S. Shoe* than the user fee in *Pace*.

But the analysis does not end there. A charge is not a tax under the Export Clause simply because it is proportional to the quantity or value of the export. Under *U.S. Shoe*, we also consider whether the charge imposed by § 4611(b) fairly matches Trafigura's use of government services.

The United States claims that the charge operates essentially as a premium for government-provided insurance, in the form of capped liability for oil spills. Those who create more risk (*i.e.*, by exporting more oil) pay a higher premium. And as for the various other government activities supported by the Fund, such as research and development for oil pollution technology, the United States characterizes them as "oil-spill-related services." Based on that characterization, the United States concludes that the charge is a fee for those services, and not an effort to raise general revenue.

No. 21-20127

Trafigura counters, however, that the charge does not offset the cost of any service that it receives from the government. It challenges the government's insurance analogy. And it stresses that § 4611(b) finances a broad range of initiatives that are not "services" provided to exporters under any reasonable sense of the word. This last point is dispositive, so there is no need to address the government's insurance analogy.

A user fee is a charge for a specific service provided to, and used by, the payor. *See U.S. Shoe*, 523 U.S. at 369. A public agency might charge a user fee to visit a public park, tour a museum, or enter a toll road. In each case, you pay the fee, and in return, you get access to something of value— natural beauty and recreation, intellectual or aesthetic enrichment, uncongested roads. Put simply, user fees arise in the context of "value-for-value transaction[s]." Jensen, *supra*, at 37.

There is no such discrete transaction here. Oil exporters subject to § 4611(b) are forced to pay for, among other things, reimbursements to federal, state, and Indian tribe trustees for assessing natural resource damage; research and development for oil pollution technology; studies into the effects of oil pollution; marine simulation research; and research grants to universities. *See* 33 U.S.C. §§ 2712(a), 2761(c). None of these things can plausibly be conceived as "services" provided to exporters in exchange for their payment.

To be sure, exporters do benefit indirectly from these activities. But the same could be said for virtually every other tax. After all, the government is supposed to use tax proceeds to provide benefits for taxpayers. The fact that people pay taxes to fund police and fire protection does not somehow turn those taxes into user fees. Likewise, the fact that oil exporters like Trafigura also happen to benefit from the government's "oil-spill-related" activities is beside the point—such benefits are not tied to a specific service

that exporters receive as part of a value-for-value transaction. Exporters pay, society benefits.

So this case is far afield from *Pace*. When an exporter pays the government for a stamp to shield the exporter from taxation, that is a value-for-value transaction that is exempt from the Export Clause. *See* 92 U.S. at 375 (stressing that "[t]he stamp was intended for no other purpose than to . . . relieve [exported tobacco] from the taxation to which other tobacco was subjected"). Here, by contrast, exporters subsidize a mishmash of anti-pollution measures for the general benefit of society.

In sum, Congress has crafted a scheme in which crude oil exporters are forced to subsidize activities that are not "services used or usable by the exporter." *U.S. Shoe*, 523 U.S. at 369. Section 4611(b) saddles exporters with the cost of anti-pollution measures that generally benefit society at large, and not specifically the exporter who pays the charge.

## C.

A few words of response to the dissent. The dissent essentially theorizes that the oil industry, taken as a whole, causes oil spills, oil pollution, and environmental damage—and that the industry should therefore be held "responsible for [its] own actions and business practices." *Post*, at 6 (Graves, J., dissenting).

Forcing any industry or citizen to internalize their externalities is of course entirely reasonable as a policy matter. Many taxes are designed with precisely this goal in mind. Think of gasoline taxes designed to pay for road and infrastructure repair, mass transit, or air pollution mitigation—or carbon taxes crafted to force taxpayers to absorb the social cost of their emissions—or "sin taxes" on alcohol or gambling that are used to cover the cost of the social consequences of alcoholism or gambling addiction.

No. 21-20127

These are commonplace measures designed to achieve important ends for society—ends that go well beyond merely defraying the costs of the government providing a particular service or benefit to members of the public. But that's precisely what makes them a tax, rather than a fee. As the dissent's theory confirms, this is not a "value-for-value" transaction, in which a feepayer pays the fee to receive a service or benefit in return, and is thus better off as a result of the transaction. *See, e.g.*, *U.S. Shoe*, 523 U.S. at 363 (defining "'user fee'" as "a charge designed as compensation for Government-supplied services, facilities, or benefits"); *Pace*, 92 U.S. at 374–75 (upholding user fee to cover "the expense attending the providing and affixing [tobacco export] stamps" in order to "relieve [the exporter] from . . . taxation"). To the contrary, it's a "penalty-for-penalty" transaction, in which the taxpayer is penalized for engaging in anti-social behavior that penalizes others.

The dissent responds that the oil export tax is indeed a "value-for-value" transaction, because oil exporters pay the fee for the right to use our nation's valuable natural resources to conduct their for-profit business. *Post*, at 7 n.8 (Graves, J., dissenting). But that proves too much. *Every* export tax can be characterized as payment for the right to use our nation's resources to conduct one's for-profit business, such as our stature and diplomatic prowess on the world stage, our defense and national security capabilities, and our access to international trade protections and governance structures.

So under the dissent's approach, Congress would be fully empowered to tax exports "under the pretext of fixing a fee." *Pace*, 92 U.S. at 376. And that would contradict not just text but history as well.

Delegates at the Constitutional Convention debated a last-minute suggestion to allow export taxes enacted for the purpose of "regulations of

No. 21-20127

trade," and to prohibit only those export taxes designed "for the purpose of revenue." 2 Farrand, *supra*, at 363. But they quickly rejected the idea.

If the Constitution forbids export taxes designed to further trade policy—and it plainly does—then there's no principled basis to allow export taxes designed to further environmental policy. That would defy the plain text as well as the Founders' understanding of our nation's charter. And Alexander Hamilton would not just "get more than he gave"—he would get more than the Constitution permits.

\* \* \*

We hold that § 4611(b) imposes a tax on exports in violation of the Export Clause. The United States may not enforce § 4611(b) on crude oil "exported from the United States." We affirm.

No. 21-20127

James E. Graves, Jr., *Circuit Judge*, dissenting:

Because there are genuine issues of material fact as to whether 26 U.S.C. § 4611 imposes a legitimate user fee, I would vacate the district court's grant of summary judgment on liability to Trafigura Trading LLC and remand. Thus, I respectfully dissent.

Trafigura is a commodity trading company that purchases and exports crude oil from the United States. Trafigura asserts that it exported some 50 million barrels of oil from Texas, Louisiana and North Dakota between 2014 and 2017. As a result, Trafigura said that it paid in some $4,215,924 pursuant to 26 U.S.C. § 4611.[1] Trafigura later requested and was denied a refund for the amount paid. Trafigura then filed suit challenging the constitutionality of 26 U.S.C. § 4611 and seeking a refund of $4,215,924 collected pursuant to the statute. *See* 26 U.S.C. § 4611(b). The district court ultimately granted summary judgment on liability to Trafigura. The government appealed.

Amounts collected under §4611(b) are transferred to the "Oil Spill Liability Trust Fund," along with amounts collected via various other acts, to be used only for specific expenditures related to oil spills. *See* 26 U.S.C. §§ 9509(b), (c); *see also* 33 U.S.C. §§ 2712(a), 2761(e). The fund also provides a limitation on liability for the responsible party. *See* 33 U.S.C. § 2704; *see also* 33 U.S.C. §§ 2701(32) (definition of "responsible party"), and 2702 (elements of liability).

The issue is whether 26 U.S.C. § 4611(b) levies an unconstitutional tax on crude oil under the Export Clause. *See* U.S. Const. art. I, § 9, cl. 5.

---

[1] There has been a petroleum fee in some form since approximately 1981. Pub. L. No. 96-510, 94 Stat. 2767.

No. 21-20127

The district court found that it does.  The majority agrees.  I disagree for the reasons stated herein.

We review the district court's grant of summary judgment de novo, applying the same standard as the district court.  *Naquin v. Elevating Boats, L.L.C.*, 817 F.3d 235, 238 (5th Cir. 2016).  Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  We construe all facts and inferences in the light most favorable to the nonmoving party.  *Naquin*, 817 F.3d at 238.

The district court's "function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Trafigura, the district court, and the plurality[2] cite *Pace v. Burgess*, 92 U.S. 372 (1876), and *United States v. U.S. Shoe Corp.*, 523 U.S. 360 (1998) as controlling authority.[3]  *Pace* involved a federal excise stamp on tobacco.  *Pace*, 92 U.S. 372.  The Supreme Court held that the stamp was a user fee, not an unconstitutional tax.  *Id.* at 375  The plurality here "cleaned up" a quote from *U.S. Shoe* on the Court's observations of *Pace*.  The original quote states:

> The Court upheld the charge, concluding that it was "in no sense a duty on exportation," but rather "compensation given for services [in fact] rendered."  In so ruling, the Court emphasized two characteristics of the charge: It "bore no

---

[2] Judge Wiener concurs only in the judgment, which means that Judge Ho's opinion does not have a quorum and does not constitute precedent in this Circuit.  *Indest v. Freeman Decorating, Inc.*, 168 F.3d 795, 796 n.1 (5th Cir. 1999) (Wiener, J., concurring).  Thus, I refer to it as the plurality when referencing any portion other than the judgment.

[3] As an initial matter, the Court in both cases reiterated that "we must regard things rather than names."  *Pace*, 92 U.S. at 376; *U.S. Shoe*, 523 U.S. at 367.  Thus, the use of "tax" in 26 U.S.C. § 4611 is not self-defining.

No. 21-20127

> proportion whatever to the quantity or value of the package on which [the stamp] was affixed"; and the fee was not excessive, taking into account the cost of arrangements needed both "to give to the exporter the benefit of exemption from taxation, and ... to secure ... against the perpetration of fraud."

*U.S. Shoe*, 523 U.S. at 369 (internal citations omitted) (alterations in original).

In *U.S. Shoe*, the Supreme Court held that an ad valorem charge of 0.125% of the cargo's value to finance harbor maintenance and development projects was an unconstitutional tax. *Id.* at 363. The Court distinguished *Pace*, saying:

> *Pace* establishes that, under the Export Clause, the connection between a service the Government renders and the compensation it receives for that service must be closer than is present here. Unlike the stamp charge in *Pace*, the [harbor charge] is determined entirely on an ad valorem basis. The value of export cargo, however, does not correlate reliably with the federal harbor services used or usable by the exporter. As the Federal Circuit noted, the extent and manner of port use depend on factors such as the size and tonnage of a vessel, the length of time it spends in port, and the services it requires, for instance, harbor dredging.

*U.S. Shoe*, 523 U.S. 369 (citation omitted). The Court also reiterated that the Export Clause "does not rule out a user fee, provided that the fee lacks the attributes of a generally applicable tax or duty and is, instead, a charge designed as compensation for Government-supplied services, facilities, or benefits." *Id.* at 363.

The district court ostensibly relied on *Pace* and *U.S. Shoe* but then misapplied the standards set out in those cases in pronouncing a test which the plurality now adopts, saying:

No. 21-20127

*Pace* and *U.S. Shoe* tell us the following.  First, we must consider whether the charge under § 4611(b) is based on the quantity or value of the exported oil—if so, then it is more likely a tax.  Second, we must consider the connection between the Fund's services to exporters, if any, and what exporters pay for those services under § 4611(b).  That connection need not be a perfect fit.  *See Pace*, 92 U.S. at 375–76.  But a user fee must "fairly match" or "correlate reliably with" exporters' use of government services.  *Id.* at 369–70.

*See also Trafigura Trading LLC v. United States*, 485 F.Supp.3d 822, 826 (S.D. Tex. 2020).  The plurality also includes a requirement of strict enforcement that does not appear in *U.S. Shoe*, which said "[i]n sum, if we are 'to guard against … the imposition of a [tax] under the pretext of fixing a fee,' [citing *Pace*, 92 U.S. at 376], and resist erosion of the Court's [precedent], we must hold that the HMT violates the Export Clause as applied to exports." *U.S. Shoe*, 523 U.S. at 370.  Importantly, the Court also said, "[t]his does not mean that exporters are exempt from any and all user fees designed to defray the cost of harbor development and maintenance. It does mean, however, that such a fee must fairly match the exporters' use of port services and facilities." *Id.*

I agree that *Pace* and *U.S. Shoe* are the applicable authority.  But I disagree with the plurality's characterization under the first part of the standard that "if so, then it is more likely a tax."  I also disagree with the plurality's characterization of the second part that we only look at services.

The plurality misapprehends *Pace* and repeatedly conflates quantity or volume with value.  While the *Pace* court did say "[i]t bore no proportion whatever to the quantity or value of the package on which it was affixed," the stamps were clearly required on each and every package of tobacco. *Id.* at

375. Thus, more packages equaled more stamps and more fees.[4] The same can be said here where the fees applied to each barrel and more barrels equal more fees. Also, importantly, the fees do not in any way depend on the value of the barrel.[5] The plurality's statement that the fee here is more like the tax in *U.S. Shoe* than the user fee in *Pace* is unsupported. The fee here is not based on the value of the oil, as in *U.S. Shoe*. Instead, the per-barrel fee here is the equivalent of the per-package stamp in *Pace*.

Under the second part, the plurality states that we must consider the government services provided to the exporters. However, *U.S. Shoe* says that we look to whether the fee is "designed as compensation for Government-supplied services, facilities, or benefits." *Id.*, 523 U.S. at 363. The *U.S. Shoe* Court held that the ad valorem tax was "not a fair approximation of services, facilities, or benefits furnished to the exporters." *Id.*

Here, the plurality essentially disregards the "services, facilities, or benefits" provided to the exporters by concluding that "[n]one of these things can plausibly be conceived as 'services' provided to exporters in exchange for their payment." The plurality then concedes that "[t]o be sure, exporters do benefit indirectly from these activities" before attempting to equate exporting oil with police and fire protection. Specifically, the plurality says:

> But the same could be said for virtually every other tax. After all, the government is supposed to use tax proceeds to provide

---

[4] The size of the packages was determined by "the discretion of the exporter or the convenience of the handler." *Id.*

[5] To the extent the plurality adopts the district court's analysis regarding the statutory definition of barrel, i.e., 42 gallons, that is the historic industry standard in the United States, not a statutory creation or requirement.

No. 21-20127

benefits for taxpayers. The fact that people pay taxes to fund police and fire protection does not somehow turn those taxes into user fees. Likewise, the fact that oil exporters like Trafigura also happen to benefit from the government's "oil-spill related" activities is beside the point—such benefits are not tied to a specific service that exporters receive as part of a value-for-value transaction. Exporters pay, society benefits.[6]

But that rationale is severely flawed and unsupported by the controlling authority.

Neither *Pace* nor *U.S. Shoe* provide any requirement that *only* the exporter must benefit. Regardless, it is implausible to suggest that random taxpayers or random members of society are the primary beneficiaries of exporters simply being responsible for their own actions and business practices. There would be no oil spills, resulting damage, or need for research and development regarding oil pollution if oil was not exported. The oil was not exported by random taxpayers or random members of society, and they are neither responsible for any subsequent pollution/damage of precious natural resources nor the beneficiaries of any cap on liability.[7] The oil is exported by exporters, who are not forced to share any resulting profit with

---

[6] The plurality also states, without support, that "exporters subsidize a mishmash of antipollution measures for the general benefit of society" and "[s]ection 4611(b) saddles exporters with the cost of anti-pollution measures that generally benefit society at large, and not specifically the exporter who pays the charge." Surely the plurality is not suggesting that random taxpayers should subsidize the operations of for-profit corporations.

[7] In fact, taxpayers and members of society pay fees for various activities. For example, if a taxpayer wanted to take his boat into the Gulf of Mexico to go fishing, he would have to purchase the appropriate registration, license, certification, etc. He would also be responsible for any damage he caused. But, much like an exporter and its profit, he would get to keep any legal amount of fish all for himself.

No. 21-20127

random taxpayers or random members of society. To borrow from the plurality, exporters pay and exporters benefit.[8]

The plurality dismisses any suggestion that the oil industry generates the need for these anti-pollution measures as a matter of policy. However, cleaning up oil spills or restoring natural resources to their pre-damaged state are not merely policy motivations. The plurality further states that "Congress has crafted a scheme in which crude oil exporters are forced to subsidize activities that are not 'services used or usable by the exporter.' *U.S. Shoe*, 523 U.S. at 369." What the *U.S. Shoe* Court actually said, though, is that "[t]he value of export cargo, however, does not correlate reliably with the federal harbor services used or usable by the exporter." *Id.* "As the Federal Circuit noted, the extent and manner of port use depend on factors such as the size and tonnage of a vessel, the length of time it spends in port, and the services it requires, for instance, harbor dredging." *Id.* Again, here, the fee is not based on the value of the oil. The charge of a fee per barrel is more akin to the above factors, like size and tonnage of a vessel, than any alleged "subsidizing" of "a mishmash of antipollution measures for the general benefit of society."[9] The plurality cites no evidence in support of the

---

[8] The plurality cites a law review article, Erik M. Jensen, *The Export Clause*, 6 Fla. Tax Rev. 1, 37 (2003), for the proposition that there is no "value-for-value transaction" here. But the plurality reasons that charging a fee to visit a public park, tour a museum, or enter a toll road would be a "value-for-value transaction." It seems reasonable that charging a fee for using this country's valuable natural resources to conduct one's for-profit business would also be a "value-for-value transaction." Notwithstanding that either would be a "value-for-value transaction," fees for a museum, park or toll road are also used for upkeep, maintenance, damage, etc.

[9] The district court found that there are various factors Congress could have "considered to structure a fee which more closely matches the service rendered." *Trafigura*, 485 F.Supp.3d at 829. However, some or all of those factors appear to have been considered, i.e., "the route taken" is in proximity to natural resources, and "the quantity

conclusion that the nominal per-barrel fee does not reliably correlate to the services used or usable by the exporter. Moreover, the fee here is substantially less than the tax in *U.S. Shoe* and provides substantially more in return.

Trafigura also asserts that exporters are solely responsible for paying the fee under § 4611. That is incorrect. The fee is not imposed on exporters; it is imposed on oil and its uses. *See* 26 U.S.C. § 4611. Trafigura is comingling separate sections and subsections when it says "nothing in § 4611 requires owners, operators, or demise charterers of vessels to pay § 4611(b) export taxes. *See* 26 U.S.C. § 4611(d)(3)." Subsection (d) states:

> (d) Persons liable for tax.--
>
> (1) Crude oil received at refinery.--The tax imposed by subsection (a)(1) shall be paid by the operator of the United States refinery.
>
> (2) Imported petroleum product.--The tax imposed by subsection (a)(2) shall be paid by the person entering the product for consumption, use, or warehousing.
>
> (3) Tax on certain uses or exports.--The tax imposed by subsection (b) shall be paid by the person using or exporting the crude oil, as the case may be.

26 U.S.C. § 4611(d). Despite Trafigura's claims to the contrary, this provision explicitly lists multiple others who may be responsible for the fee, depending on the situation. Moreover, the language Trafigura searches for actually comes from 33 U.S.C. § 2701(32), which references "any person

---

of oil" is the number of barrels. *See* 33 U.S.C. § 2701(20) ("'natural resources' includes land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States . . . , any State or local government or Indian tribe, or any foreign government.").

No. 21-20127

owning, operating, or demise chartering." Additionally, the fee under §
4611(b) is only imposed if "before such use or exportation, no tax was
imposed on such crude oil under subsection (a)." *See* § 4611(b)(1)(B). In
other words, if someone else pays it pursuant to subsection (a), then it would
not be imposed a second time under subsection (b). Simply because
Trafigura was the appropriate person to pay here does not mean that only an
exporter ever has to pay. Moreover, Trafigura is free to negotiate its
contracts with other entities in a manner to attempt to recoup any required
fees.

Trafigura also asserts that exporters are omitted from the definition of
"responsible party" and would not benefit from the liability limits. *See* 33
U.S.C. § 2701(32). That statement is also not entirely correct. While §
2701(32) does not specifically list "exporters," it clearly lists numerous
others, including "the owner of the oil being transported." Trafigura
acknowledges that it "purchases and exports domestic crude oil from the
United States." Thus, Trafigura concedes ownership of the oil in question
which would establish its status as a potential responsible party.

The plurality fails to distinguish this case from *Pace*; it fails to
reference any facts to support its conclusion that the fees here were excessive
or improper; and it fails to cite or apply the full standard of review. We are
reviewing the district court's grant of summary judgment; not weighing the
evidence or determining the truth of the matter. *Anderson*, 477 U.S. at 249.
This court is required to construe all facts and inferences in the light most
favorable to the government. *See Naquin*, 817 F.3d at 238. "[C]ourts may
not resolve genuine disputes of fact in favor of the party seeking summary
judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). As set out herein,
Trafigura failed to show that there is no genuine dispute of material fact or
that it was entitled to judgment as a matter of law. Thus, summary judgment
was improper.

No. 21-20127

For these reasons, I would vacate the district court's grant of summary judgment on liability to Trafigura and remand. Accordingly, I respectfully dissent.